U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2024 SEP -9 PM 1:30

| | | |
|---|---|---|
| UNIVERSITY OF VERMONT | * | Civil Action No. |
| STUDENTS FOR JUSTICE IN | * | |
| PALESTINE, | * | BY _____ DEPUTY CLERK |
| Plaintiff | * | 2:24-CV-978 |
| | * | |
| v. | * | |
| | * | |
| THE UNIVERSITY OF | * | |
| VERMONT and STATE | * | |
| AGRICULTURAL COLLEGE; | * | |
| and LINA BALCOM, UVM | * | |
| Director of Student Life and | * | |
| JEROME BUDOMO, UVM | * | |
| Associate Director of Student Life, | * | |
| each in their Official Capacities, | * | |
| Defendants | * | |

## VERIFIED COMPLAINT OF PRIOR RESTRAINT OF FREE SPEECH RIGHTS AND OF OTHER VIOLATIONS OF THE FEDERAL CIVIL RIGHTS ACT

**PARTIES.**

1) The plaintiff University of Vermont Students for Justice in Palestine (hereinafter "UVMSJP") is a student organization founded in 2011 at the University of Vermont and State Agricultural College (hereinafter "UVM") whose purpose is to advocate for justice of the Palestinian people.

2) The defendant UVM is an institution of higher education which is an instrumentality of the State of Vermont. Lina Balcom is the UVM Director of Student Life. Jerome Budomo is the UVM Associate Director of Student Life.

1

**JURISDICTION.**

3) Federal question jurisdiction is provided by 28 U.S.C. §1331, and §1343(a)(3). Supplemental jurisdiction over any state law questions is provided by 28 U.S.C. §1367.

**FACTS.**

4) During the spring of 2024 demonstrations sprung up on college campuses across the nation in opposition to the war in Gaza, to the United States' supplying of military aid to Israel for prosecution of that war, in support of humanitarian aid to Gaza, and in support of an immediate cease fire there.

5) Vermont's U.S. Senators Bernie Sanders and Peter Welch along with Congresswoman Becca Balint voted against this military aid and in support of the cease fire.

6) Retired U.S. Senator Patrick Leahy stated that Israel must be held to account under the so-called "Leahy Laws" for its use of U.S. military aid to prosecute activities which constitute "gross violation of human rights."

7) On the rainy and cold afternoon of April 28, 2024 a 10-day demonstration commenced at UVM with about 50 students with about a dozen tents.

8) The demonstration occurred on a small grassy triangular portion of the Andrew Harris Commons, a large green surrounded by the Davis Center, the Terrill Building, Marsh Life Sciences Building, and the Howe Library, located in the City of Burlington.

9) The Andrew Harris Commons is used as a public forum.

10) UVMSJP was not a formal sponsor of this demonstration but collaborated with others participating in and encouraged participation it.

11) The activities of the participants were peaceful protest and symbolic speech. They included teach-ins, lectures, and group discussions.

12) Many of the demonstration participants include Jewish students who are not Zionists and who oppose Israel's policies.

13) Burlington City Councilor and UVM student Marek Broderick was a demonstration participant.

14) The activities included holding a Seder during the early evening of April 28th in solidarity with Jews and non-Jews and to mark the final day of Passover.

15) UVM attempted unsuccessfully to obstruct the conduct of the Seder by preventing food to be brought into the site of the demonstration. *See* vtcynic.com/news/live-updates-students-held-encampment-for-divestment-on-andrew-harris-commons. (The *Vermont Cynic* is the UVM student newspaper published by UVM on the internet).

16) During the course of the demonstration there were also counter-demonstrators on the Commons in support of Israel and of U.S. policy toward Israel, including those sponsored by Students Supporting Israel ("SSI"). *Vermont Cynic, supra.*

17) The demonstrators had trained de-escalators available to calm confrontations and prevent any violence between demonstrators and counter-demonstrators.

18) The participants' rights to peacefully engage in this activity was supported by Vermont Lt. Governor David Zuckerman, Burlington Mayor Emma Mulvaney-Stanak, as well as a number of members of the Burlington City Council.

19) U.S. Senator Bernie Sanders introduced a resolution in the U.S. Senate supporting the right of students to peacefully engage in such protest activities.

20) On May 1, 2024, UVMSJP received a notice that its status as a UVM student organization was being suspended because

> it may pose a threat to the health, safety, or wellbeing of persons within the university community and our guests... Please inform all individuals affiliated with SJP that while the SJP is under interim suspension all organization activities must cease. This interim suspension will permit organization meetings related to any internal investigation. (Attachment #1).

UVMJSP disputes the charges.

21) Under the *Procedures* of UVM's *University Operating Procedure-Student Organization Misconduct Investigation and Resolution*, <u>Assessment of Interim Actions</u> it was Director Balcom who had the authority to make the decision to order the interim suspension. (Attachment #2).

22) This order suspended UVMSJP's rights to engage in any activities on UVM's campus pending an investigation, including -- with the exception of internal organizational meetings relating to UVM's investigation -- the rights to speak, organize, recruit and associate, and to use campus resources available to other student organizations, requiring UVMSJP to engage in self-censorship and to refrain from any activities unrelated to UVM's investigation.

23) No specific underlying factual allegations of who, what, when, where, and how supporting these conclusory allegations were provided to UVMSJP, despite that on April 28, 2024 UVM Police services set up an LTV Solar camera in order to "give us an opportunity to try to follow up with some source of material that could provide better avenues of trying to investigate what happened" *Vermont Cynic, supra.*

24) Despite numerous student protests and demonstrations at UVM over the years, upon information and belief there is no recent precedent for the suspension of a UVM student organization for participating in them.

25) Those recent previous protests and demonstrations include

- **September 17, 2017:** Two hundred students marched into the Waterman Building to the UVM President's office with a list of demands regarding racial disparity by the University. The participating organizations were the Black Student Union, Alianza Latinx, and Asian Student Union.

- **February 20-23, 2018:** A student group called "NoNames for Justice" held various demonstrations regarding racial injustice on campus. They took over classrooms. They blocked traffic on Main Street by the Davis Center at rush hour. They then marched into the Waterman Building and along with Black Lives Matter occupied the atrium area inside the building for 10 hours.

- **February 26, 2019**: "NoNames for Justice" held a rally inside the atrium inside the Waterman Building at 2 PM to mark the one-year anniversary of the earlier so-called "Waterman Occupation."

- **September 20, 2019:** Hundreds of students walked out of classes at 11 AM to strike and attend a strike rally on the Andrew Harris Commons to protest inaction on climate change. Participating groups included the Vermont Public Interest Research Group (VPIRG), the Sunrise Movement; Climate Communications Advocacy; and the Literacy Laboratory.

- **September 23, 2019:** A student group called "Extinction Rebellion BTV" blocked traffic on Main Street by the Davis Center during rush hour to protest inaction on climate change.

- **February 18, 2021:** A group of #metoo students staged a protest of UVM's Admitted Students Visit Day to protest UVM's response to allegations of sexual assault on campus, especially on the part of members of its athletics teams. This complained of sexual assault is the now subject of the lawsuit *Ware v. UVM*, 2:22-cv-212 (D. Vt., Sessions, J). Two to three hundred students congregated at Andrew Harris Commons and proceeded through the Davis Center marching and chanting.

- **May 3, 2021:** Thousands of students gathered on the Redstone Green to again protest UVM's alleged complicity in sexual assault. They blocked traffic while they marched to the UVM Green and then the Waterman Building. There they

held a protest and rally on the steps of the building which spilled over onto adjoining South Prospect Street and the UVM Green, blocking traffic.

- **Annual 4/20 protests:** Prior to the legalization of marijuana under Vermont law, thousands of students annually held an annual protest and a "smoke-in" on the UVM south campus annually on April 20th.

26) The only reported student discipline regarding these prior demonstrations occurred in April of 2019 was brought against about 9 individual students who spoke at the February, 2019 commemoration of the so-called "Waterman Occupation."

27) They were given individual warnings that their activities were not permitted at that venue because it disrupted ongoing administrative and classroom activities in the Waterman building, and other more suitable venues for the protest were available on campus.

28) The defendants' actions against UVMSJP have been part of its hostile, chilling, content-based animus and bias against pro-Palestinian speakers.

29) On October 23, 2024 UVM cancelled the appearance of Palestinian poet Mohammed El-Kurd who was scheduled to speak at the University on October 26, 2023.

30) UVM claimed that this was done because UVM's Division of Safety and Compliance stated that it could not provide adequate safety and security.

31) However, a subsequent Vermont Public Records Act documents request by the publication *Seven Days* revealed that UVM had received no threats related to the event.

32) It had been subject to urging from pro-Israel groups claiming that his works were antisemitic.

33) The defendants failed to take any disciplinary action against counter-demonstrators on the common who support Israeli policies or student organizations such as SSI.

34) The defendants' actions have occurred in the context of a larger hostile and chilling anti-Palestinian climate including the shootings of three Palestinian students on North Prospect Street just blocks north of the UVM campus on Thanksgiving weekend, 2023.

35) There is no provision under the *Procedures* of UVM's *University Operating Procedure-Student Organization Misconduct Investigation and Resolution* to contest an interim suspension order. The suspension of these rights remained and remains effective as long as the investigation and sanctioning process is pending and until it is completed. As of this writing it has been in effect for over four months.

36) By its terms, this May 1, 2024 order stated that the investigation would be led by Jerome Budomo, Associate Director of Student Life.

37) The *Assessment of Interim Actions* provision UVM's *Operating Procedure* for *Student Organization Misconduct Investigation and Resolution* states "(i)n the case of the Interim Suspension of activities, in whole or in part, the University will make reasonable efforts to implement the procedures outlined herein for considering the complaint as quickly as feasible under the circumstances."

38) Despite that, on July 31 and August 9, 2024 Director Balcom sent emails to UVMSJP claiming that the investigation had yet to be initiated.

39) This delay was a pretext to continue the interim suspension. The UVM Police Services already had the protest under surveillance and investigation since late April.

7

40) On August 12, 2024 UVMSJP's counsel requested along with faculty Advisor Helen Scott to meet with Director Balcom requesting re-evaluation of the May 1, 2024 order suspending UVMSJP. In an August 15, 2024 email and ensuing conversation, UVM's General Counsel rejected this request and stated that UVMSJP's options would be participation in (a) an administrative conference or (b) the investigation process.

41) A re-evaluation of the interim suspension is a different procedure than that provided by the *Pre-Investigation Administrative Conference* section of the *Procedure*. The later provides only for a waiver signed by the student organization which "admit(s) to the specific facts that comprise the violation(s) and accept responsibility for all violations in lieu of proceeding to formal investigation."

42) In an August 21, 2024 letter and in an email of August 27, 2024 UVMSJP again offered to participate in a "meet and confer" re-evaluation conference, but declined to make any such admission and therefore declined to participate in an *Administrative Conference*. Defendants' counsel again rejected the offer.

43) Under the alternative option -- the *Investigation Process* of that *Procedure* -- if a student organization is to participate in the investigation, it is required to proceed *pro se.* Its advisors "may not speak on behalf of, or otherwise represent their advisees…Advisors may be present only to provide support to, or otherwise privately consult with, their advisee, but may not speak on behalf of their advisee or otherwise directly participate." Moreover, "Advisors may not be lawyers, although the Director of Student Life may permit a lawyer as an Advisor when related criminal charges are filed and pending."

44) Because these restrictions violate the due process and equal protection clauses of the 14th Amendment as set forth in Count VI below, UVMSJP in its August 21st letter

8

also declined to participate in the *Investigation Process*.

## COUNT I-
## THE MAY 1, 2024 SUSPENSION ORDER WAS AND IS AN UNCONSTITUTIONAL PRIOR RESTRAINT OF PROTECTED FIRST AMENDMENT ACTIVITIES

45)    UVMSJP seeks declaratory and injunctive relief, including under 42 U.S.C. §1983, that the May 1, 2024 suspension order was and remains an unconstitutional prior restraint of UVMSJP's First Amendment rights including to speak, associate, to peaceably assemble, to organize, and to use the same campus resources available to other student organizations, and that the defendants' failure to provide UVMSJP with prior notice of, or opportunity to be heard regarding, the suspension order renders the prior restraint presumptively invalid under the First Amendment.

## COUNT II-
## UVM CANNOT AS A REMEDY SANCTION UVMSJP BY SUSPENDING ITS FIRST AMENDMENT RIGHTS.

46)    UVMSJP seeks a declaratory judgment and injunctive relief, including under 42 U.S.C. §1983, that the defendants have no constitutionally permissible basis either on an interim or permanent basis to sanction UVMSJP by suspension of its First Amendment rights, including to speak, assemble, organize, recruit, associate, and to use campus resources available to other student organizations.

## COUNT III-
## UVMSJP CANNOT CONSTITUTIONALLY BE SANCTIONED BECAUSE UVM'S POLICIES AND PROCEDURES REGARDING DEMONSTRATIONS ARE CONTRADICTORY, PROVIDE UNBRIDLED ADMINSTRATIVE DISCRETION TO RESTRICT PROTECTED SPEECH, AND SUCH RESTRICTIONS IN ANY EVENT WERE WAIVED.

47)    The defendants' Notice to UVMSJP erroneously stated that UVM's policy *Facilities and Grounds Use for Events and Activities* and its *Procedures* (Attachment #3)

required that the demonstration be permitted by University Event Services (UES) and under its standards.

48) Instead, UVM's *Posting and Solicitation Policy* (Attachment #4) defines "noncommercial solicitation" as "including without limitation…preaching, proselytizing, political organizing, canvassing, and campaigning…"

49) It provides that "(p)rior registration is not required for casual forms of non-commercial solicitation, such a leafletting, that do not involve the dedicated or exclusive use of University property…" and that "(u)nless they have already been reserved by another individual or group, lawful non-commercial solicitation may occur in shared publicly available areas of the campus."

50) The April 28-May 7 demonstrations, rallies and protests complied with this directive.

51) On Sunday, April 28th, the first evening of the demonstration, UVM Chief of Safety and Compliance Officer told the demonstrators in substance that, according to the *Vermont Cynic, supra,* "The only issue here is the tents. Everything else that's happening is within our guidelines for a demonstration."

52) One outspoken member of UVMSJP was individually charged with student misconduct with regard to the demonstration, rallies, and protests.

53) The May 1, 2024 charge letter was verbatim the same charges leveled against UVMSJP in support of its interim suspension (Attachment #5).

54) On May 10, 2024 UVM found that there was no violation of policy by demonstrating because "Participating in a protest is not a policy violation." (Attachment #6).

55) UVM also had earlier determined in this case that there was no violation of the *Facilities and Grounds Use for Events and Activities* because "it pertains only to permanent structures" and declined to pursue the allegation. *Id.*

56) UVM's *Policy* also makes separate provisions for consideration of demonstrations and rallies from the UES.

57) Under *Policy* **§1) Request or use a.,** this prior UES permit application requirement does not apply to "campus demonstrations or rallies." They instead "are handled by the Office of the Dean of Students."

58) This *Policy* also makes no distinction between campus demonstrations and rallies on public forum and non-public forum property of the University.

59) This *Policy* section supplies no standards for the Dean of Students to exercise his/her separate administrative jurisdiction and discretion regarding whether to require permits for campus demonstrations and rallies, or whether to grant, condition, or withhold such permits, and therefore provides him/her with unbridled discretion to permit, deny, or condition such events.

60) Moreover, even if UVM's *Facilities and Grounds Use* policy was otherwise sufficiently narrowly tailored regarding "campus demonstrations and rallies," the defendants could not simply use its permitting requirements as a pretext to deny them a permit altogether. The First Amendment's narrow tailoring requires that the defendants provide an alternative location on campus for the demonstration suitable for the demonstrators' message to reach their intended audience.

11

61)     Because of these ambiguities and contradictions in UVM's policies, the unbridled discretion, and lack of narrow tailoring, UVM students were constitutionally entitled to disregard any prior permit requirements for the demonstrations and rallies.

62)     In any event, the defendants implicitly condoned and consented to the demonstration and thereby waived any requirement for permits.

63)     UVM President Suresh Garimella later praised this approach in a mass-distributed email circulated in early August, (Attachment #7):

> One uncertainty that cast a shadow around the world- including on our campus – is the escalation of hostilities in the Middle East beginning last fall and continuing even now. On campus, passionate concerns were expressed through peaceful demonstrations and vigils. Even when our community members' points of view were at odds, a sense of mutual respect prevailed. Unlike many other institutions across the nation, UVM emerged in May from several weeks of protests with no serious disruptions, injuries, or arrests. I attribute our relative success largely to our community's adherence to the university's <u>Our Common Ground</u> values: Respect, Integrity, Innovation, Openness, Justice, and Responsibility.

64)     UVMSJP seeks declaratory and injunctive relief, including under 42 U.S.C. §1983, that any sanction against UVMSJP for the protest and rally activities including the interim suspension of UVMSJP violates UVMSJP's First Amendment rights and 14th Amendment rights to due process and equal protection.

**COUNT IV-**
**UVMSJP CANNOT CONSTITUTIONALLY BE SANCTIONED BECAUSE**
**UVM'S "TEMPORARY STRUCTURES" POLICY**
**PROVIDES UNBRIDLED ADMINISTRATIVE DISCRETION,**
**IS NOT NARROWLY TAILORED, AND IN ANY EVENT WAS WAIVED.**

65)     The erection of tents is recognized as a powerful form of symbolic speech protected by the First Amendment.

66)     Sleeping overnight in tents, however, is not constitutionally protected symbolic speech.

67)     To its credit, UVM's *Temporary Structures* policy expressly recognizes this (Attachment #8).

68)     On one hand, that policy purports to allow placement of tents in various public form sites on the campus, including "Howe Library and Davis Center Quad" and the "Davis Center Oval and Outdoor Stage area."

69)     But on the other hand, rather than being narrowly tailored, the permitting process for temporary structures such as tents provides at critical junctures unbridled administrative discretion to deny, hamstring, or chill the timely expression of this protected symbolic speech; to wit:

- Chief Safety and Compliance Officer must first approve the permit. However, no standards as provided for satisfaction of this threshold requirement.

- Here, at the beginning of the protest the Chief Safety and Compliance Office Schirling had already told the students that they would all be suspended if they did not remove the tents immediately. *Vermont Cynic, supra.*

- He was the same official who recommended the cancellation of the appearance of the Palestinian poet Mohammed El-Kard in October of 2023.

- After permit approval, a formal UES request must be submitted to University Event Services.

- The request to UES next requires a financial commitment "by an individual or official authorized to commit the funds of the individual, unit, group, organization, or entity."

- UES has the discretion to require and charge fees for the use of the space, or to waive the same, without any standards governing such waiver.

- Presumably the "Rules" section of the *Temporary Structures* "Procedures" Nos. 1-13 then come into play.

- Rule #10 in turn provides that "at the University's discretion, requests may be denied if they… is (sic) otherwise deemed disruptive or a safety risk" giving unbridled discretion how such determination can be made.

Law Office of John L. Franco, Jr. 110 Main Street Burlington, Vermont 05401
(802) 864-7207
johnfrancolaw@aol.com

- The duration of the display may or may not be extended beyond one week, but again, without any standards by which that discretion may be exercised.

70) Moreover, even if UVM's temporary structure policy were otherwise narrowly drawn, the defendants cannot simply use its permitting requirements to prohibit tents as a symbolic form of protest. The First Amendment's narrow tailoring also requires that the defendants provide a suitable and timely alternative location on campus for the tents as a symbolic form of protected First Amendment expression.

71) Consequently, because of this unbridled discretion and lack of narrow tailoring, UVM students were constitutionally entitled to disregard any advance permitting requirement for the tents.

72) In the aforementioned UVMSJP student conduct action, UVM also found there was no violation because "you never set up a tent and…you can't control other students in terms of making them comply with the University's directions."

73) At no time did the defendants take any action to have the tents forcibly removed.

74) At no time did the defendants provide UVMSJP as an organization with a notice of trespass regarding them as provided by ¶13 of the *Temporary Structure* policy "Rules"

75) The tents were voluntarily removed by the demonstrators at the conclusion of the protest on May 7-8, 2024.

76) The defendants thereby condoned or consented to the tents at this location and thereby implicitly waived any requirement for prior permits.

77) UVMSJP requests declaratory and injunctive relief, including under 42 U.S.C. §1983, that any sanction against UVMSJP for the erection and maintenance of the tents,

14

including the interim suspension, therefore violates and violated UVMSJP's First Amendment rights and 14th Amendment rights to due process and equal protection.

## COUNT V-
## UVMSJP CANNOT CONSTITUTIONALLY BE SANCTIONED UNDER *EX PARTE YOUNG* BECAUSE OF UVM'S DUE PROCESS VIOLATIONS.

78) The procedural due process clause of the 14th Amendment is satisfied only when there is an opportunity after notice to in good faith first test the validity of administrative orders without the risk of incurring debilitating or confiscatory penalties by doing so.

79) The defendants failed to accurately notify any of the students including UVMSJP of the applicable UVM administrative rules, that their activities – with the exception of sleeping overnight in the tents -- were presumptively protected speech under the First Amendment, that UVM had a constitutional obligation to accommodate that speech, that any restrictions UVM imposed must be narrowly tailored, and that suitable alternative location for the protest and the tents would have to be supplied by UVM if the Andrew Harris Common location were unacceptable. Instead, they chose and have chosen to weaponize procedural permitting issues and the student misconduct process to bully and intimidate UVMSJP and other students, chilling the exercise of their protected First Amendment rights on campus.

80) The defendants consequently failed to provide any students including UVMSJP with fair notice of the conduct that was forbidden, what was legitimate and constitutionally required for their demonstration and tents, adequate alternative avenues of expression, or for an opportunity to cure any such constitutionally unprotected activities.

Law Office of John L. Franco, Jr. 110 Main Street Burlington, Vermont 05401
(802) 864-7207
johnfrancolaw@aol.com

81) UVMSJP seeks a declaratory judgment and injunctive relief, including under 42 U.S.C. §1983, that under procedural due process because of these and the issues discussed in Count I through IV are "fairly debatable," that students had an objective good faith basis to believe that their activities were lawful and/or that permit requirements had been waived, and that UVMSJP cannot now be sanctioned.

## COUNT VI-
## UVM'S POST SUPENSION INVESTIGATIVE AND SANCTIONING PROCEDURES VIOLATE FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS AND THE FIRST AMENDMENT RIGHT OF ASSOCIATION

82) UVM's *Procedures* for investigating and substantiating a violation subsequent to the issuance of the interim suspension order, and for then imposing permanent sanctions, provide that

- "If an organization does not accept responsibility for the alleged violations by signing (a) waiver, wishes to contest the alleged violation, or does not accept the sanction outlined by the Director, an investigation will be initiated."

- "The purpose of an investigation conducted pursuant to these procedures is to determine whether University Policy, as alleged, has been violated."

- On one hand, the student organization "may decline to participate" in the *Investigation Process*. In such case a "finding may be reached, and a sanction may be imposed based on the information available."

- On the other hand, if the student organization decides to participate in the *Investigation Process*, they must proceed *pro se*. Its advisors "may not speak on behalf of, or otherwise represent their advisees…Advisors may be present only to provide support to, or otherwise privately consult with, their advisee, but may not speak on behalf of their advisee or otherwise directly participate."

- Moreover, "Advisors may not be lawyers, although the Director of Student Life may permit a lawyer as an Advisor when related criminal charges are filed and pending."

- "Upon completion of the investigation, the investigator shall submit an Investigation Report to the Director and the Student Organization Representative,

16

including a determination as to whether or not the alleged misconduct by the Student Organization is substantiated. If the misconduct is found to be substantiated, the Investigation Report will be forwarded by the Director to the Student Organization Accountability Panel for sanctioning."

- The Director's finding is final. "The sole purpose of the Panel Meeting is to determine the appropriate sanctions(s) for violations of University Policy found by a preponderance of the evidence and detailed in the Report of Investigation. The Panel meeting is not the appropriate venue to appeal a finding of responsibility."

- "Any violation of these directives will be considered aggravating circumstance(s) and will lead to harsher sanctioning."

- The Dean of Students, or her/his designee, is the final decision-maker whether there was a violation and what if any sanctions there will be for any violation(s).

83) UVMSJP seeks declaratory and injunctive relief, including under 42 U.S.C. §1983, that the defendants' denial of the active assistance of counsel in the conduct of its defense when confronting the full administrative apparatus of the University of Vermont during the *Investigation Process* involving the exercise of protected First Amendment rights, and the imposition of any sanctions by the defendants for the exercise of those rights, violate Fourteenth Amendment rights to procedural due process.

84) UVMSJP seeks declaratory judgment and injunctive relief, including under 42 U.S.C. §1983, that by requiring, in the context of a charge involving protected First Amendment activities, UVMSJP to actively defend itself during the *Investigation Process* and the sanctioning process only by proceeding *pro se* without the active assistance of counsel, the defendants also deny and denied its First Amendment rights of freedom of association.

17

**Relief Requested.**

UVMSJP requests the court, including pursuant to 42 U.S.C. §1983, to issue a declaratory judgment that the defendants violate and have violated the First and Fourteenth Amendments as set forth above, to issue a preliminary and permanent injunction reinstating UVMSJP's student organization status at UVM, to prohibit the imposition of sanctions against UVMSJP, to award it reasonable litigation expenses and reasonable attorneys' fees under 42 U.S.C. §1988, and to award such other legal and/or equitable relief which may be just and reasonable.

Dated at Burlington, Vermont this 9th day of September, 2024.

John L. Franco, Jr.
Attorney for
UVM Students for Justice
in Palestine

18
Law Office of John L. Franco, Jr. 110 Main Street Burlington, Vermont 05401
(802) 864-7207
johnfrancolaw@aol.com

## DECLARATION OF LOGAN PREWITT

I am a member of UVMSJP. I participated in the UVM Gaza War protests, and demonstrations of April 28-May 8, 2024. I verify under penalty of perjury that the forgoing statements in paragraphs numbers 1, 2, 7, 8-17, 20, 22, 23, 28-30, 34, 36, 38-43, 52-55, 62, 72-76, and 79 are true based upon personal knowledge, and the foregoing statements in paragraphs numbers 4-6, 18, 19, 31-33, 48-50, 51, and 63 are true based upon information and belief.

Dated at Burlington, Vermont this 9th day of September, 2024.

_____
Logan Prewitt

## DECLARATION OF DR. HELEN SCOTT

I am the faculty advisor to UVMSJP. I observed the UVM Gaza War protests and demonstrations of April 28-May 8, 2024. I verify under penalty of perjury that the forgoing statements in paragraphs numbers 1, 2, 7, 8, 9, 11, 12, 14-17, 20, 22, 23-32, 34, 36, 38-43, 48-50, 62, 63, 73, 75, 76, 79 are true based upon personal knowledge, and the foregoing statements in paragraphs numbers 4-6, 10, 13, 18, 19, 24, 25, 33, and 51 are true based upon information and belief.

Dated at Burlington, Vermont this 9th day of September, 2024.

_____
Dr. Helen Scott