UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| UNIVERSITY OF VERMONT STUDENTS FOR JUSTICE IN PALESTINE,<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNIVERSITY OF VERMONT AND STATE AGRICULTURAL COLLEGE; and LINA BALCOM, UVM DIRECTOR OF STUDENT LIFE and JEROME BUDOMO, UVM ASSOCIATE DIRECTOR OF STUDENT LIFE, EACH IN THEIR OFFICIAL CAPACITIES,<br><br>    Defendants. | Civil Action No. 2:24-cv-978 |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants University of Vermont and State Agricultural College ("UVM" or the "University"), Lina Balcom, and Jerome Budomo, by and through their attorneys, Dinse P.C., oppose Plaintiff's "Motion for a Preliminary Injunction *Pendent Lite*." ECF No. 2. Interim suspension of a Recognized Student Organization under the circumstances presented here is not an unconstitutional prior restraint of speech as a matter of law. Accordingly, Plaintiff cannot succeed on the merits—or otherwise demonstrate a preliminary injunction is warranted—and the Motion should be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is one of scores of UVM's Recognized Student Organizations. *See* https://clubs.uvm.edu/organizations. Official recognition confers certain rights, and also comes with certain conditions. Like UVM students, these groups are required to adhere to UVM

policies and procedures to maintain good standing. Compl. Att. 2, ECF No. 1-3.[1] In accordance with the Code of Student Conduct and related policies, individual students, as well as Recognized Student Organizations and their officers, may be held collectively responsible when violations of University policy occur. *Id.*

There is no dispute that Plaintiff and its members participated and encouraged participation in a ten-day demonstration on the Andrew Harris Commons, also referred to as the Davis Center Green, between April 28, 2024 and May 8, 2024. Compl. ¶ 8, 10. The demonstration included at least a dozen tents that were present throughout.[2] *Id.* ¶ 7.

But the Complaint leaves out important context that this Court should consider when assessing Plaintiff's likelihood of success on the merits. Plaintiff and its members received multiple warnings that their conduct was violating UVM policies and that there could be consequences under those policies if their conduct persisted.

On the first afternoon of the demonstration, Lina Balcom, Director of Student Life, and Jerome Budomo, Associate Director of Student Life, were present close in time to its start. Balcom Decl. ¶ 4. There were tents, pop up tents, and tables present when they arrived. *Id.* ¶ 5. Ms. Balcom provided one of Plaintiff's members with two copies each of the Temporary Structures policy, the Free Expression, Campus Speakers, Response to Disruption policy, and the Facilities and Grounds Use for Events and Activities policy. *Id.* ¶ 6. One copy of the Temporary Structures policy had key points about tents needing a permit in advance highlighted. *Id.* ¶ 7.

---

[1] This policy is also available at https://www.uvm.edu/sites/default/files/UVM-Policies/policies/studentorg.pdf.

[2] In reality, there were far more than a dozen tents present. Campus police counted over eighty tents present in the encampment.

Ms. Balcom told Plaintiff's representative student that having a protest or rally was not a policy violation and, if they took down the tents, they would not be asked to leave. *Id.* ¶ 8.

Over the course of eight hours (from approximately 3:00 pm to 11:00 pm) on the first day of the demonstration, Ms. Balcom had conversations with several of Plaintiff's members. *Id.* ¶ 9. She repeatedly stated that the University supported students' rights to free speech and to protest, as long as it did not violate any policy or disrupt University operations. *Id.* ¶ 10.  She also repeated that sleeping in a tent between 8:00 pm and 8:00 am violated University policy. *Id.* ¶ 11.  At one point, the conversation with students included an offer to have a permit issued for a pop-up tent if the sleeping tents came down. *Id.* ¶ 12. The students, however, chose not to take their tents down.  Instead, Plaintiff's social media account announced an encampment had been established and called for others to join. *Id.* ¶ 13; Exhibit 1.

Ms. Balcom's conversations with Plaintiff's members continued over the course of the next day, April 29, 2024.  Balcom Decl. ¶ 14.  She reiterated the importance of staying within University policy while protesting and referred again to the tents as problematic and a policy violation.  *Id.*  Later that evening, Ms. Balcom and Mr. Budomo met with students affiliated with Plaintiff and shared a written notice from the University regarding the demonstration. *Id.* ¶ 15. It outlined the pertinent policy violations and the conduct process for students and organizations that violated a policy. *Id.* ¶ 16; Exhibit 2.  Ms. Balcom, Mr. Budomo, and another employee distributed copies of the notice to all of the students that they saw present.  Balcom Decl. ¶ 17; They distributed 112 copies in total. *Id.*

The following day, April 30, 2024, Ms. Balcom and others continued conversations with Plaintiff's members in a similar vein to the day prior. *Id.* ¶ 19.  Plaintiff's social media posts made clear that students camped overnight and were planning to do so again. *Id.* ¶ 18; Exhibit 3.

Those posts coincided with messages sent by a Telegram account used to coordinate the encampment, offering tent space for individuals "to spend the night." *Id.* ¶ 20; Exhibit 4.

On May 1, 2024, a number of students who were not participating in the protest complained that they were being disturbed by the demonstrators while studying in the library. Balcom Decl. ¶¶ 21-22. Ms. Balcom let one of Plaintiff's members and its then-President, Logan Prewitt, know that was a new potential policy violation and asked them to bring down the volume of their chants. *Id.* ¶ 23. She shared information that she and others had gathered with David Nestor, then Dean of Students. *Id.* ¶ 24.

While the demonstration was ongoing that day, Dean Nestor sent a notice to Plaintiff that the University received information about alleged conduct by Plaintiff that, if true, would violate University policies and specifically listed:

- Using the Davis Center Green to the exclusion of others for non-commercial solicitation without a reservation
- Disruption of scheduled tabling and other reservation of space outside the Davis Center
- Disruption of normal student engagement and/or academic work patterns
- Setting up tents ("temporary structure") on the Davis Center Green without a permit and declining to remove them when requested
- Overnight occupancy of a temporary structure
- Encouraging and facilitating the violation of policy by other students.

Compl. Att. 1, ECF No. 1-2 ("Notice"); Nestor Decl. ¶ 4; Exhibit 7.[3] The Notice invoked, linked to, and quoted from the Student Organization Misconduct Investigation and Resolution policy (Compl. Att. 2, ECF No. 1-3), the Solicitation and Posting policy (Compl. Att. 4, ECF No. 1-5), the Temporary Structures policy (Compl. Att. 8, ECF No. 1-9), the Facilities for Grounds Use for Events and Activities policy (Compl. Att. 3, ECF No. 1-4) the Free Expression; Campus

---

[3] The Notice attached to the Complaint has been altered. The Notice as sent to Plaintiff was addressed to Logan Prewitt. Mr. Prewitt verified the Complaint in part.

Speakers; Response to Disruption policy,[4] and the Code of Student Conduct.[5] *See* Compl. Att. 1, ECF No. 1-2.

The Notice explained that the operations of Plaintiff were suspended on an "interim basis" because of continuing "concerning behavior and encouragement of willful violation of university policies following repeated notice and requests to cease," which "had a direct impact on the safety of students and university operations." Exhibit 7. The Notice further explained that an investigation would be conducted "to gather information relevant to the above listed allegations in order to settle the matter." *Id.*

On May 2, 2024, Dean Nestor sent Mr. Prewitt an email with an attached letter. Nestor Decl. ¶ 6; Exhibit 8. Dean Nestor's communications offered Plaintiff a Pre-Investigation Administrative Conference, which was an opportunity to meet and discuss any interest Mr. Prewitt might have in resolving the Student Organization Misconduct case prior to the full investigation process. *Id.* Dean Nestor gave Mr. Prewitt the option to decline the meeting and noted his choice not to meet would have no bearing on the more formal investigation process. *Id.* The attached letter indicated that if Mr. Prewitt chose to meet, Dean Nestor would share a copy of the referral report. *Id.*

In response to Dean Nestor's email, Helen Scott, Plaintiff's faculty advisor, stated that she had a conflict and asked for more time to schedule a meeting after classes ended. Exhibit 9. Dean Nestor agreed to that request, and they planned to meet Monday, May 6. *Id.*

---

[4] This policy is available at https://www.uvm.edu/sites/default/files/UVM-Policies/policies/demonstrations.pdf. The version that was posted at the time of the encampment is attached as Exhibit 13.

[5] This policy is available at https://www.uvm.edu/sites/default/files/UVM-Policies/policies/studentcode.pdf. The version that was posted at the time of the encampment is attached as Exhibit 14.

However, on May 4, 2024, Dean Nestor alerted Dr. Scott and Mr. Prewitt that Mr. Prewitt could not represent the organization because, as an individual student, his conduct was under review pursuant to the Center for Student Conduct process. *Id.* Dean Nestor asked whether they wanted to pause the process or identify another student who was not scheduled for an individual conduct case to represent the organization. *Id.* Dr. Scott ultimately asked to "table" the meeting at that time. *Id.* The demonstration ended a few days later on May 8, 2024. Compl. ¶ 7. That coincided with the beginning of final exams. *See* https://www.uvm.edu/registrar/uvm-academic-calendar-2023-2024.

Weeks or months in advance of the encampment, multiple vendors requested to use space on the green through the University's normal reservation process. Between April 30, 2024 and the end of the encampment, several cancelled or rescheduled their reservations out of concern or discomfort with tabling near it. Balcom Decl. ¶¶ 28-31, 33. Additionally, Campus Programs also moved or cancelled two programs as a result of the encampment. *Id.* ¶ 32. Students had expressed discomfort and Campus Programs staff did not want anyone to feel uncomfortable at their planned events. *Id.*

Ms. Balcom tried to reach Mr. Prewitt by text message on May 21, July 3, and July 30, 2024 in an effort to determine a suitable alternative student representative, but received no response. *Id.* ¶ 26; Exhibit 5. Ms. Balcom also sent an email and copied Dr. Scott on July 31, 2024. Balcom Decl. ¶ 27; Exhibit 6. On August 6, 2024, Mr. Prewitt responded by email that he and others were out of Burlington over the summer and otherwise out of touch. *Id.* Mr. Prewitt identified another student representative on August 6, 2024. *Id.*

On August 12, 2024, Plaintiff's counsel, John Franco, Esq., became involved and began communicating with counsel for UVM. Nestor Decl. ¶ 8; Exhibit 8. On August 20, 2024,

Attorney Franco sent a letter by email to counsel for UVM and indicated that Plaintiff would decline to name a student representative (despite Mr. Prewitt already having done so) and would not participate in either an administrative conference or the investigation process. *Id.*

At the beginning of the academic year, Dean Nestor sent an email to the individual Mr. Prewitt identified as the alternative student representative. Nestor Decl. ¶ 9; Exhibit 11. It repeated the invitation to meet and discuss the options to resolve the process, and also included the prior communications with Mr. Prewitt. *Id.* Dean Nestor suggested meeting the next day, August 28, 2024. *Id.* Dean Nestor received no response. Nestor Decl. ¶ 10. On August 29, 2024, he sent another message to the identified student representative and referred the matter to Jerome Budomo to lead the investigation process. *Id.* ¶¶ 11-12; Exhibit 12. Plaintiff filed the instant Motion and Complaint on September 9, 2024.

## ARGUMENT

### I. Plaintiff is not entitled to a preliminary injunction.

Plaintiff asks this Court to enter a preliminary injunction "ending the defendants' May 1, 2024 interim suspension of its status as a UVM student organization pending the resolution of this litigation." Mot. at 1. Plaintiff claims its interim suspension as a student organization is an unconstitutional prior restraint of its First Amendment rights.[6]

To obtain that relief, Plaintiff must establish that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat.*

---

[6] Defendants have moved to dismiss all of Plaintiff's claims in a concurrently-filed motion, but this Opposition focuses solely on the prior restraint claim since that is the only claim at issue in Plaintiff's motion for a preliminary injunction.

*Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The burden is squarely on Plaintiff to make "a clear showing" that it is entitled to this "extraordinary and drastic remedy." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation omitted).

### A. Plaintiff is unlikely to succeed on the merits.

A prior restraint "is a government action that restricts speech on the basis of 'the speech's content and in advance of actual expression.'" *Ware v. Univ. of Vt. & State Agricultural Coll.*, __ F. Supp. 3d. __, 2024 WL 989804, at *33 (D. Vt. 2024) (Sessions, J.) (citing *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005)).  UVM does not dispute that it may not violate its students' First Amendment rights.  UVM likewise does not dispute that speech generally may not be limited merely because it is controversial or provocative.  UVM does dispute, however, Plaintiff's claim that suspending a Recognized Student Organization on an interim basis pending an investigation regarding alleged policy violations is a constitutional violation.

Plaintiff relies heavily on *Healy v. James*, 408 U.S. 169 (1972).  Some of the general principles reflected in *Healy* are not controversial and certainly are not disputed by Defendants.  For example, the *Healy* Court recognized the "mutual interests of students, faculty members, and administrators in an environment free from disruptive interference with the educational process," *id.* at 171, and the "comprehensive authority" of public educational institutions to "prescribe and control conduct" within the bounds of "constitutional safeguards" due to the "special characteristics" of the educational environment.  *Id.* at 180; *see also Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).

However, *Healy* is also distinguishable in important ways.  It dealt with *a priori* non-recognition of a potential student organization, not an interim suspension pending investigation

of policy violations. There, students desiring to form a local chapter of Students for a Democratic Society were denied official recognition at the time of their application. This prevented them from ever using campus facilities for meetings and other appropriate purposes. *Healy*, 408 U.S. at 181. For example, students were not allowed to hold a meeting in the campus coffee shop because they were not an approved group. In addition, the petitioners were not permitted to ever use the campus bulletin boards or the school newspaper, which, at the time, were the most significant communication channels available. *Id.* There is no allegation in the Complaint or Plaintiff's motion that Plaintiff's interim suspension has prevented it from ever using campus facilities or communication channels.

Plaintiff also omits a key holding from *Healy*. Even the *Healy* Court upheld the basic notion that "**recognition, once accorded, may be withdrawn or suspended if petitioners fail to respect campus law**." *Id.* at 194 n.24 (emphasis added). *Healy* is not an obstacle to imposing a temporary suspension when a student organization is alleged to have violated University policies.

The law on recognition of student organizations has also evolved since 1972. This Court should be guided by *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010) (Ginsburg, J.)—a far more recent case that Plaintiff has failed to address entirely. Hastings College of the Law, like UVM, extends official recognition to student groups, with attendant benefits and conditions. *Id.* at 669-70. The *Hastings* Court determined that the law school's Recognized Student Organization (RSO) program was a limited public forum. *Id.* at 679 n.12. There is no reason this Court should reach

a contrary conclusion here about UVM's RSO program. [7]  Accordingly, the key question under a limited public forum analysis is whether the access barrier is reasonable and viewpoint neutral. *Id.* at 680; *see also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *Johnson v. Perry*, 859 F.3d 156, 172 (2d Cir. 2017).

*Hastings* demonstrates that there has been no constitutional deprivation here.  "Private groups . . . commonly maintain a presence at universities without official school affiliation" and "nonrecognition of a student organization" is not "equivalent to prohibiting its members from speaking," particularly in the era of "electronic media and social-networking sites . . . ." 561 U.S. at 690-91. [8] *Iota XI Chapter of the Sigma CHI Fraternity v. Patterson*, 538 F. Supp. 2d 915 (E.D. Va. 2008) is also instructive.  A fraternity at George Mason University had its official recognition suspended after it violated University policies.  The *Iota XI* court held that the "withdrawal of recognition did not in and of itself deprive Chapter members of their First Amendment rights." *Id.* at 923-24.  Rather, "the withdrawal of official recognition simply removes the imprimatur of the University from the Chapter's activities and denies the Chapter use of the University's name, resources, and property." *Id.*; *see also Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 58 F. Supp. 2d 619, 625 (W.D. Pa. 1999), *aff'd*, 229 F.3d 435 (3d Cir. 2000) (holding withdrawal of recognition of fraternity was not a First Amendment violation).

Plaintiff was not and has not been prevented from speaking or associating because of its viewpoint.  It has lost official recognition—the imprimatur of the University—pending the outcome of the investigation and resolution process for Recognized Student Organizations

---

[7] Indeed, virtually every recent case involving a First Amendment speech challenge to a university policy or regulation has been analyzed under the limited public forum framework. *Keister v. Bell*, 461 F. Supp. 3d 1152, 1169 (N.D. Ala. 2020), *aff'd*, 29 F.4th 1239 (11th Cir. 2022) (collecting cases).

[8] Plaintiff continues to have an active social media presence.  *See* https://www.instagram.com/uvm.sjp/.

because it is alleged to have violated neutral policies that serve important interests after receiving repeated warnings that persisting in its conduct would result in this process.  This is constitutionally permissible under *Healy* and *Hastings*.  Plaintiff was suspended for alleged policy violations such as overnight camping in tents that posed safety risks and disrupted others' access, not protesting per se.

An interim suspension policy serves an important purpose and UVM's policy is reasonable.  No one would dispute that it may be necessary to suspend on an interim basis a student or an employee who is alleged to have engaged in conduct that interferes with safety, security, or individual welfare, or who is alleged to have obstructed another student's access to their education.  The same general reasoning applies to Recognized Student Organizations that are at risk of threatening the "safety, security or welfare of the University community and/or an obstruction to accomplishing the University's lawful mission." Compl. Att. 2, ECF No. 1-3.  Some situations require an urgent interim response.  An interim suspension is also an important option when a student organization ignores repeated warnings to cease conduct that violates University policies, and thus obstructs the University's educational mission and impacts the entire educational community.  There would be no way to meaningfully enforce University policies if interim action could not be taken.  The interim suspension is intended to maintain order and prevent further harm until the conduct process may be resolved.

Plaintiff objects that the length of time that it has taken to move the process forward is evidence that it is being unfairly targeted.  But the passage of time is largely due to its former representative's non-responsiveness in the weeks that followed the end of the encampment, its members being away and out of contact during the summer break, and its refusal to participate in the process after the new semester resumed.  In the meantime, no individual student has been

prevented from exercising any right protected by the First Amendment and the pending conduct process will be resolved with or without Plaintiff's participation. The passage of time alone is not sufficient to demonstrate a likelihood of success on the merits.

### B. Plaintiff has failed to meet the other requirements for the extraordinary relief it seeks.

Because Plaintiff cannot succeed on the merits, it cannot demonstrate irreparable harm. Plaintiff's motion focuses only on the first prong of the test (success on the merits) and makes no attempt to justify how the equities tip in its favor or how a preliminary injunction would be in the public interest. To the contrary, it would be inequitable to interfere with UVM's ongoing investigation and resolution process and only Plaintiff would benefit from a preliminary injunction. *See SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021) (holding that the balance of equities and public's interest in securing First Amendment rights were "of no help" where the plaintiff was unlikely to succeed on a First Amendment claim). It is Plaintiff's burden to prove that all of the factors are met to impose this extraordinary remedy and none are. *See e.g.*, *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of New York*, 502 F.3d 136, 144 (2d Cir. 2007) (reversing trial court's preliminary injunction where its categorical approach to alleged constitutional harm lacked appropriate nuance); *Bloch v. Bouchey*, No. 2:23-CV-00209, 2023 WL 9058377, at *30 (D. Vt. Dec. 28, 2023) (denying motion for preliminary injunction where plaintiff sought to strike down harassment, hazing, and bullying policies).

## CONCLUSION

Plaintiff has suffered no constitutional injury. It cannot succeed on the merits, it has not suffered irreparable harm, and has not remotely justified a preliminary injunction under the circumstances. Plaintiff's motion should be denied.

Dated at Burlington, Vermont this 25th day of September 2024.

/s/ Kendall Hoechst
Kendall Hoechst, Esq.
Dinse P.C.
209 Battery Street, P.O. Box 988
Burlington, VT  05402
(802) 864-5751
khoechst@dinse.com

Counsel for Defendants
