UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| UNIVERSITY OF VERMONT STUDENTS FOR JUSTICE IN PALESTINE,<br>    Plaintiff,<br><br>  v.<br><br>THE UNIVERSITY OF VERMONT AND STATE AGRICULTURAL COLLEGE; and LINA BALCOM, UVM DIRECTOR OF STUDENT LIFE and JEROME BUDOMO, UVM ASSOCIATE DIRECTOR OF STUDENT LIFE, EACH IN THEIR OFFICIAL CAPACITIES,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 2:24-cv-978<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **DEFENDANTS' MOTION TO DISMISS**

Defendants University of Vermont and State Agricultural College ("UVM" or the "University"), Lina Balcom, and Jerome Budomo, by and through their attorneys, Dinse P.C., move to dismiss the "Verified Complaint of Prior Restraint of Free Speech Rights and of Other Violations of the Federal Civil Rights Act," ECF No. 1, pursuant to Fed. R. Civ. P. 12(b). Because Plaintiff has failed to state any claim upon which relief can be granted, it lacks standing and its claims lack ripeness, and because Defendants are entitled to qualified immunity, the entire Complaint should be dismissed.

### INTRODUCTION

UVM—as every public university should be—is deeply committed to the principles of free expression enshrined in the First Amendment. The UVM community is a rich marketplace of ideas. Its educational mission is strengthened by civil discourse and the free and respectful exchange of diverse points of view—including controversial ones. The passionate advocacy and

activism of its students and employees are part of UVM's diverse tapestry and are an integral part of its academic values.

But because UVM's mission is fundamentally one of education, speech on its campus cannot be unlimited. There must be some guardrails to keep students, employees, visitors, and guests safe, and to enable all students to reasonably access their education and limited University resources. UVM has developed a set of policies that represent these guardrails and they are entitled to appropriate deference under Supreme Court precedents. UVM's relevant policies are detailed, specific, and entirely agnostic as to the content of speech. This case is not and should not be about Palestine or politics, or even the basic right to protest, which even Plaintiff implicitly acknowledges UVM supports.

Plaintiff's Complaint truly takes aim at UVM's policies, and that likewise should be the Court's focus. But Plaintiff asks this Court to rule in advance of any final disciplinary determination that it cannot be constitutionally sanctioned for any of the policy violations it is alleged to have engaged in. This request is premature and, even if it were not, the Complaint fails to allege any viable claim based on the University's policies or its interim suspension of Plaintiff. Plaintiff likewise has failed to allege a violation of procedural due process as a matter of law. At a minimum, Defendants are entitled to qualified immunity to the extent Plaintiff seeks damages. For all these reasons, Defendants ask the Court to dismiss the Complaint.

## FACTUAL ALLEGATIONS

UVM has scores of Recognized Student Organizations. Plaintiff is one of them. Official recognition confers certain rights. Recognized Student Organizations may (with some exceptions and conditions): (1) use the name of the University and other indicia of association, (2) use University buildings and grounds without a rental charge, (3) use University mail

services on an unstamped basis, (4) obtain a voicemail account, (5) obtain an email account, and (6) establish an agency account with the University.  *See* Group and Organization Recognition, *available at* https://www.uvm.edu/sites/default/files/UVM-Policies/policies/grouprecognition.pdf.[1]

Recognition comes with a requirement of compliance with university policies and procedures.  Like its students, these groups must adhere to UVM policies and procedures to maintain good standing and official recognition.  *See* Compl. Att. 2, ECF No. 1-3.  In accordance with the Code of Student Conduct and related policies, individual students, as well as Recognized Student Organizations and their officers, may be held collectively responsible when violations of University policy occur.  *Id.*

As a general matter, UVM permits free expression, including protests and demonstrations.  *See e.g.* Freedom of Expression – Interim, *available at* https://www.uvm.edu/sites/default/files/UVM-Policies/policies/freeexpression.pdf (describing commitment to free expression and policies relevant to expression on campus).[2]  There is no dispute that the conduct that is at the heart of the Complaint included erection and maintenance of at least a dozen tents that remained on University property for ten days, from April 28, 2024 to May 8, 2024, on the Andrew Harris Commons (also referred to as the Davis Center Green) on

---

[1] The Court may consider documents that are properly subject to judicial notice without converting this Motion into a motion for summary judgment.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *see also* 5B C. Wright & A. Miller, *Federal Practice & Procedure* § 1357 (3d ed.) (explaining that federal courts are "not limited to the four corners of the complaint" in ruling on a motion to dismiss).  As the University's policies and procedures form the basis of Plaintiffs' claims, the Court may take judicial notice of them.

[2] *See supra* n.1.

UVM's campus.  Compl. ¶¶ 7, 8.  Plaintiff acknowledges that it collaborated with participants and encouraged participation in the encampment.  *Id.* ¶ 10.  Plaintiff further implicitly acknowledges that it disregarded permit requirements, *id.* ¶¶ 61, 71, and that individuals slept overnight in the encampment tents that were present on the Commons until encampment participants removed the tents on May 8, 2024, *id.* ¶¶ 51, 75, 78.  These and other specific actions are alleged to have violated UVM's policies.

While the encampment was ongoing, on May 1, 2024, David Nestor sent a notice to Plaintiff that the University received information about alleged conduct by Plaintiff that, if true, would violate University policies and specifically listed:

- Using the Davis Center Green to the exclusion of others for non-commercial solicitation without a reservation
- Disruption of scheduled tabling and other reservation of space outside the Davis Center
- Disruption of normal student engagement and/or academic work patterns
- Setting up tents ("temporary structure") on the Davis Center Green without a permit and declining to remove them when requested
- Overnight occupancy of a temporary structure
- Encouraging and facilitating the violation of policy by other students.

Compl. Att. 1, ECF No. 1-2 ("Notice").  The Notice invoked, linked to, and quoted from the Student Organization Misconduct Investigation and Resolution policy (Compl. Att. 2, ECF No. 1-3), the Posting and Solicitation policy (Compl. Att. 4, ECF No. 1-5), the Temporary Structures policy (Compl. Att. 8, ECF No. 1-9), the Facilities and Grounds Use for Events and Activities policy (Compl. Att. 3, ECF No. 1-4) the Free Expression; Campus Speakers; Response to Disruption policy,[3] and the Code of Student Conduct.[4]

---

[3] This policy is available at https://www.uvm.edu/sites/default/files/UVM-Policies/policies/demonstrations.pdf.  The version that was posted at the time of the encampment is attached as Exhibit 1.

[4] This policy is available at https://www.uvm.edu/sites/default/files/UVM-Policies/policies/studentcode.pdf.  The version is the same version that was posted at the time of the encampment.

The Notice explained that the operations of Plaintiff were suspended on an "interim basis" because of continuing "concerning behavior and encouragement of willful violation of university policies following repeated notice and requests to cease," which "had a direct impact on the safety of students and university operations." Compl. Att. 1, ECF No. 1-2. The Notice further explained that an investigation would be conducted "to gather information relevant to the above listed allegations in order to settle the matter." *Id.*

The encampment's end coincided with the end of the spring semester and the beginning of the summer break. This timing and other factors described in Defendant's Opposition to Plaintiff's motion for a preliminary injunction prevented the University from moving forward with its process until the beginning of this semester. *See* Compl. ¶ 38.[5]

## ARGUMENT

**I.      Plaintiff has not alleged a prior restraint as a matter of law.**

Plaintiff alleges that its interim suspension "was and remains an unconstitutional prior restraint" of its First Amendment rights. Compl. ¶ 45. This claim is the subject of the preliminary injunction Plaintiff seeks. For the reasons that Plaintiff is unlikely to succeed on the merits set forth in Defendants' concurrently-filed Opposition to that motion—which Defendants incorporate by reference here—Plaintiff has not alleged an unconstitutional prior restraint as a matter of law. Briefly, Plaintiff has only been suspended on an interim basis pending the outcome of the investigation process because it is alleged to have violated neutral and reasonable University policies. The interim suspension portion of the policy serves an important purpose. Under *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 690-91 (2010) (Ginsburg, J.), non-recognition of a student

---

[5] These emails are exhibits to Defendant's Opposition to the motion for a preliminary injunction and are incorporated by reference in the Complaint. *See supra* n.1.

organization is not equivalent to prohibiting its members from speaking or associating. *Cf.* Compl. ¶ 45 (asserting Plaintiff's "rights including to speak, associate, to peaceably assemble, to organize, and to use . . . campus resources" have been impacted). Accordingly, Plaintiff has not alleged an unconstitutional prior restraint as a matter of law.

## II. Plaintiff's claims are premature where no decision regarding any policy violation has been made.

Plaintiff alleges that it cannot constitutionally be sanctioned in the future for the policy violations that have been alleged in the Notice and asserts that various UVM policies are facially unconstitutional. *See* Compl., Counts II, III, IV, & V. But there is no allegation in the Complaint—nor could there be—that Plaintiff has been found responsible for a policy violation. There has been no finding of responsibility, no permanent sanction imposed and thus, no actual injury. Moreover, the investigation may not lead to any sanction at all, let alone an allegedly unconstitutional one. Plaintiff thus lacks standing, and these claims lack ripeness. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Accordingly, this Court lacks jurisdiction to decide them. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does."). Even if these claims presented a sufficient case or controversy, it would not be prudent for this Court to hear them until UVM's process has been completed. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) ("The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). Based on these deficiencies alone, Counts II through V should be dismissed.

### III. UVM's policies pass constitutional muster as a matter of law.

#### A. A public university is a limited public forum.

Even if Plaintiff's claims in Counts II, III, IV, and V were justiciable, they would still fail as a matter of law. The First Amendment "does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 129 (1981); *see also Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (per curiam) (upholding "blanket policy" prohibiting all protests at West Point). The First Amendment's guarantees "have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Greer v. Spock*, 424 U.S. 828, 836 (1976) (internal citation and quotation marks omitted). "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

Public universities are no exception to these general rules and have unique considerations in light of their role in society. Plaintiff alleges that the "Andrew Harris Commons is used as a public forum." Compl. ¶ 9. This allegation is not precise, as there are different types of public fora. But the Complaint contains no further allegations regarding the purported nature of the forum other than this bare assertion. The vast weight of authority confirms that public colleges and universities should be considered limited public fora with unique considerations due to their educational imperatives and specific campus contexts. *See, e.g.*, *Keister v. Bell*, 461 F. Supp. 3d 1152, 1169 (N.D. Ala. 2020), *aff'd*, 29 F.4th 1239 (11th Cir. 2022) (explaining "virtually every recent case involving a First Amendment speech challenge to a university policy regulation, or

action has been analyzed under the 'limited public forum' framework" and collecting cases (citation omitted)).  As the Supreme Court has observed:

> A university differs in significant respects from public forums such as streets or parks or even municipal theaters.  A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.

*Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).  The Supreme Court has "cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review."  *Christian Legal Soc'y*, 561 U.S. at 686 (cleaned up).

In a limited public forum, restrictions on speech must be "reasonable in light of the purpose served by the forum" and may not "discriminate against speech on the basis of its viewpoint."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Johnson v. Perry*, 859 F.3d 156, 172 (2d Cir. 2017) ("In a limited public forum, regulations governing the content of speech are allowed, so long as they are 'reasonable' and 'viewpoint-neutral.'").

### B.  UVM's policies are reasonable and viewpoint-neutral.

Plaintiff has not alleged any viewpoint-based restriction on speech as a matter of law.  Plaintiff has not, and could not, allege that any policy included in the Notice it received contains any reference whatsoever to any point of view.  This includes the three policies that are identified in Counts II through V.

First, the Posting and Solicitation policy (Compl. Att. 4, ECF No. 1-5) requires students and organizations to register through University Events Services for "reserved and exclusive use" of campus facilities, including any part of the Andrew Harris Commons.  While casual forms of solicitation do not require registration, "exclusive use of University property" explicitly

does.[6] Yet even casual uses are subject to "restrictions designed to avoid disruption and protect public safety and maintain usual University operations." *Id.* Any proposed registration is "granted on a viewpoint-neutral basis" and subject only to "applicable time, place, and manner provisions." *Id.* This balancing ensures that students and organizations can use campus grounds for expressive purposes while "protect[ing] public safety and avoid[ing] undue disruption of University operations." *Id.* The objective is to "preserve the appearance, accessibility, and physical integrity of the campus" while simultaneously "enhanc[ing] the educational experience of its students, all in furtherance of the University's educational mission." *Id.*

There can be no dispute that the Posting and Solicitation policy serves significant and justifiable interests "in light of the special characteristics of the school environment." *Widmar*, 454 U.S. at 267 n.5 (citation omitted). The University has a strong interest in providing a safe and nondisruptive environment when allowing students to use campus areas where students frequently traffic for classroom or extracurricular activities. *See Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011) (describing university's significant interests in regulating competing uses of a highly trafficked area of campus and ensuring safety and order); *Bowman v. White*, 444 F.3d 967, 980 (8th Cir. 2006) (recognizing that university had "significant interests" in ensuring public safety, minimizing disruption of the educational setting, and coordinating use of limited space by multiple entities). It also has a significant interest in permitting all of its students to access grounds and facilities for expressive or educational endeavors. *Widmar*, 454 U.S. at 267 n.5 ("A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the

---

[6] Plaintiff alleges its demonstration complied with the policy. *Cf.* Compl. ¶¶ 48-50. That may be true in some respects, but it cannot claim that the protest did not also violate the policy through "exclusive use" of the space of the encampment for ten days. Compl. Att. 4, ECF No. 1-5.

use of its campus and facilities."); *Christian Legal Soc'y*, 561 U.S. at 686 ("A college's mission—and its concomitant license to choose among pedagogical approaches—is not confined to the classroom, for extracurricular programs are, today, essential parts of the educational process.").

The Temporary Structures policy (Compl. Att. 8, ECF No. 1-9) is likewise reasonable and neutral. It recognizes that, although temporary structures may constitute speech in some circumstances, that speech must be balanced "with other concerns as well, such as the safety of . . . students and employees; the condition and appearance of . . . campus; and the prudent use of our financial and human resources." *Id.* The Temporary Structures policy therefore provides a procedure for students and organizations to schedule and erect temporary structures, including tents. But by its plain terms, "overnight occupancy of a temporary structure" is prohibited for safety and security reasons for all. *Id.* Thus, the Temporary Structures policy is facially neutral and promotes the University's significant interest in the safe management of using those spaces for educational and expressive purposes, all without compromising the physical property itself or impeding speech. *See Bloedorn*, 631 F.3d at 1238; *see also Healy v. James*, 408 U.S. 169, 194 n.24 (1972) (recognizing college's "rulemaking power to assure that the traditional academic atmosphere is safeguarded"); *Christian Legal Soc'y*, 561 U.S. at 695 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (quoting *Ward*, 491 U.S. at 791)). Furthermore, its ban on sleeping in temporary structures is constitutional. *See Blanton v. State Univ. of N.Y.*, 489 F.2d 377, 386-87 (2d Cir. 1973) (holding that state university could permissibly prohibit students from sleep-in as a form of advocacy because it inhibited other students' ability to use the occupied space).

Finally, in a similar vein, the Facilities and Grounds Use for Events and Activities policy (Compl. Att. 3, ECF No. 1-4) serves identical interests to the policies already discussed. *Rosenberger*, 515 U.S. at 832 (describing "the unremarkable proposition that the State must have substantial discretion in determining how to allocate scarce resources to accomplish its educational mission"). The University has implemented this policy to "facilitate responsible stewardship of institutional resources and to protect the safety and security of persons and property." *Id.* To further that substantial interest, the policy sets forth a procedure for reserving campus spaces for gatherings. Again, these are important interests, and the policy has no regard for any content or the viewpoint of any person or entity seeking to reserve a space.

The facts alleged by Plaintiff do not establish that any UVM policy or Defendants' enforcement thereof was unreasonable. *See, e.g.*, *Powe v. Miles*, 407 F.2d 73, 85 (2d Cir. 1968) (affirming dismissal and upholding enforcement of demonstration policy); *Sigma Lambda Upsilon/Senoritas Latinas Unidas Sorority, Inc. v. Rector & Visitors of Univ. of Va.*, 503 F. Supp. 3d 433, 445-47 (W.D. Va. 2020) (granting motion to dismiss and upholding enforcement of hazing policy); *see also Clark*, 468 U.S. at 294 (affirming regulation forbidding sleeping in tents was "defensible either as a time, place, or manner restriction or as a regulation of symbolic conduct").

    **C. Plaintiff has not alleged facts sufficient to demonstrate pretextual application or unconstitutional discretion.**

Plaintiff seems to be alleging that UVM's reasonable, facially neutral policies of general application were applied to it pretextually because the demonstrators supported Palestine while other demonstrators on campus that supported different causes were not disciplined. *See* Compl. ¶ 28 ("The defendants' actions against UVMSJP have been part of its hostile, chilling, content-

based animus and bias against pro-Palestinian speakers."); *see also* Compl. ¶¶ 25-27, 33 (describing other protests and demonstrations).

The demonstration at issue here, however, was unprecedented. The scale of the protest in terms of both its length and the amount of disruption to campus activities was unlike any other. For example, none of the alleged comparators described in the Complaint included multiple days of use of a large, central area of campus and overnight camping in dozens of tents. *Cf.* Compl. ¶¶ 25-27.

Moreover, UVM does not have jurisdictional authority to discipline or suspend individuals or groups of individuals who are not students or employees. Three Recognized Student Organizations are specifically identified in connection with a single event: a one-time march into the President's office. *Id.* ¶ 25 (describing the "participating organizations" as "the Black Student Union, Alianza Latinx,[7] and Asian Student Union"). The Complaint is devoid of any allegation that a Recognized Student Organization violated a University policy or procedure. The remainder are not Recognized Student Organizations—a "student group" or group of students is not equivalent. Just as the University cannot suspend or expel a non-student community member for violating its policies, it cannot suspend or derecognize a third-party or community organization. In short, these other campus events do not demonstrate viewpoint discrimination as a matter law.

Plaintiff's isolated reference to counter-demonstrators supportive of Israel present near the encampment does not save its claims. Compl. ¶ 33. The policy violations upon which the interim suspension is based involve conduct, not speech. The counter-demonstrators referenced by Plaintiff were engaging in speech, not in conduct such as unauthorized erection and

---

[7] There is Recognized Student Organization called Alianza de Latines. *See* https://clubs.uvm.edu/organizations.

maintenance of tents, interference with registered use of University space by other groups, and interference with student's ability to study without disruption in the library. *Id.* There is no allegation that the counter-demonstrators violated the same policies that Plaintiff is alleged to have violated.

In addition to pretext, Plaintiff alleges the Facilities and Ground Use for Events and Activities policy gives "unbridled" discretion to the Dean of Students in connection with granting permits for "campus demonstrations and rallies." Compl. ¶¶ 59, 61. Likewise, Plaintiff alleges the Temporary Structures policy gives "unbridled" discretion in connection with the permitting process for erecting tents and other temporary structures. *Id.* ¶ 69. These allegations are contradicted by the content of these policies. As set forth above, discretion is reasonable and constitutional in light of the purposes served by the policies and the deference given in an educational context.

### IV. Plaintiff has not alleged a violation of procedural due process violation as a matter of law.

#### A. Plaintiff had notice of the conduct prohibited under UVM's relevant policies.

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Ware v. Univ. of Vt. and State Agric. Coll.*, __ F. Supp. 3d __, 2024 WL 989804, at *28 (D. Vt. Mar. 7, 2024) (quoting *Radwan v. Manuel*, 55 F. 4th 101, 123 (2d Cir. 2022)).

Plaintiff alleges two different procedural due process violations in Counts V and VI. In Count V, Plaintiff asserts Defendants failed to provide Plaintiff with "fair notice of the conduct that was forbidden" and "the applicable UVM administrative rules." Compl. ¶¶ 79, 80. This allegation should be dismissed out of hand. Even accepting the facts as alleged in the Complaint

as true,[8] Plaintiff has attached to its Complaint the very policies that disprove this claim. While (as set forth above) the application of the policies may be a separate matter, there can be no question that the written policies supplied unambiguous notice of conduct that was forbidden (e.g. exclusive use of the Andrew Harris Commons without a permit). Moreover, for perhaps the most salient policy violation—overnight sleeping in tents—Plaintiff has conceded that conduct was not protected. Compl. ¶ 79. Count V should be dismissed.

### B. Direct participation of counsel is not required in the context of student organization discipline.

In Count VI, Plaintiff alleges that the University's general prohibition on lawyers as advisors in the Registered Student Organization misconduct investigation process violates its rights to procedural due process and freedom of association. Compl. ¶¶ 83, 84. To be clear, Plaintiff has not alleged that it is prohibited from consulting with counsel, nor could Plaintiff make such an allegation as consultation with counsel is not prohibited under the policy. Due process, quite simply, does not require a university to allow the active assistance of counsel during student organization misconduct investigations and resolutions. *See, e.g.*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005) ("Ordinarily, colleges and universities need not allow active representation by legal counsel or some other sort of campus advocate."); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 16 (1st Cir. 1988) ("[T]he weight of authority is against representation by counsel at disciplinary hearings, unless the student is also facing criminal charges stemming from the incident in question."); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) (Posner, J.) ("Even if a student has a constitutional right to consult counsel . . . we do not think he is entitled to be represented in the sense of having a lawyer who is permitted to examine or cross-examine witnesses, to submit and object to documents, to address the tribunal, and

---

[8] UVM reserves its right to dispute Plaintiff's factual allegations.

otherwise to perform the traditional function of a trial lawyer. To recognize such a right would force student disciplinary proceedings into the mold of adversary litigation." (emphasis omitted)); *Henson v. Honor Comm. of U. Va.*, 719 F.2d 69, 74 (4th Cir. 1983) ("It is true that Henson was not permitted to have a practicing attorney conduct his defense, but this is not a right generally available to students facing disciplinary charges."). Accordingly, this claim also should be dismissed.

### V.     At a minimum, Defendants are entitled to qualified immunity.

The Second Circuit has recognized the pervasive lack of clarity regarding the free speech rights of university students, acknowledging that "the law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges, and the relevant Supreme Court cases can be hard to reconcile[.]" *Radwan*, 55 F.4th at 120 (cleaned up). Although *Radwan* involved a vulgar gesture by a student-athlete rather than a ten-day encampment by a Recognized Student Organization, the Court of Appeals' qualified immunity analysis is instructive nonetheless. As the Second Circuit observed, the four leading Supreme Court cases addressing students' free speech rights[9] "all addressed the First Amendment question in the context of students in public schools from grades K-12" and the Supreme Court "has suggested that these holdings may not apply with equal force in college and university settings." *Id.* at 117 (citing *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 238 n.4 (2000) (Souter, J., concurring)). Against this backdrop of uncertainty, "courts have not hesitated to grant qualified immunity to university officials" in student speech cases. *Id.* at 122. That should

---

[9] Those cases are *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); and *Morse v. Frederick*, 551 U.S. 393 (2007).

especially be the case here, where the alleged policy violations involve conduct undertaken by a student group and do not involve concerns with the message of support of Palestinians in Gaza.

There is even less clarity in the context of student organizations. In the absence of Second Circuit or Supreme Court precedent recognizing a clearly established right that was infringed, Plaintiff must identify "a robust consensus of cases of persuasive authority" to overcome the qualified immunity defense here. *Id.* at 114 (citation omitted). Plaintiff cannot do so. Accordingly, at a minimum, Defendants are entitled to qualified immunity as a matter of law to the extent Plaintiff seeks damages.

## CONCLUSION

The Constitution does not require that students or student organizations be permitted to exercise their right to protest or demonstrate anywhere at any time and in any manner. In order to fulfill their educational mission, public universities may impose reasonable and viewpoint-neutral limitations on campus in order to ensure safety, access, and order. Plaintiff is alleged to have violated some of UVM's policies along those lines. While no final determination has been made and many of Plaintiff's claims are premature, UVM may constitutionally suspend and discipline student organizations for policy violations, including without the direct assistance of counsel. Plaintiff has not alleged any constitutional violation as a matter of law, and, therefore, the Complaint should be dismissed.

Dated at Burlington, Vermont this 25th day of September 2024.

/s/ Kendall Hoechst
Kendall Hoechst, Esq.
Dinse P.C.
209 Battery Street, P.O. Box 988
Burlington, VT  05402
(802) 864-5751
khoechst@dinse.com

Counsel for Defendants