UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNIVERSITY OF VERMONT STUDENTS FOR JUSTICE IN PALESTINE,<br>    Plaintiff, | )<br>)<br>)<br>) | |
| | ) | |
| v. | ) | Civil Action No. 2:24-cv-978 |
| | ) | |
| THE UNIVERSITY OF VERMONT AND STATE AGRICULTURAL COLLEGE; and LINA BALCOM, UVM DIRECTOR OF STUDENT LIFE and JEROME BUDOMO, UVM ASSOCIATE DIRECTOR OF STUDENT LIFE, EACH IN THEIR OFFICIAL CAPACITIES, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFF'S VERIFIED COMPLAINT**

Defendants University of Vermont and State Agricultural College ("UVM" or the "University"), Lina Balcom, and Jerome Budomo, by and through their attorneys, Dinse P.C., submit this reply in support of their Motion to Dismiss. ECF No. 9. In its Opposition, Plaintiff misunderstands or misstates the pertinent legal standards, mischaracterizes its own Complaint, and improperly introduces new allegations. None of this, however, saves its claims.

**I.    Count I does not allege an unconstitutional prior restraint.**

Plaintiff claims that its interim suspension is a prior restraint of its right to engage in First Amendment activities. Compl. ¶ 45. But the suspension was not premised on Plaintiff's speech. Rather, it was based on Plaintiff's **conduct**, without any regard to the content of Plaintiff's message. Compl. Att. 1, ECF No. 1-2. That does not meet the legal definition of a prior restraint—where speech is suppressed based on its "content and in advance of its actual

expression." *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005).

It makes no difference that some of the underlying conduct involved tents. Assuming *arguendo* that erecting tents was a form of expressive conduct, that right is not limitless. As the Supreme Court has frequently noted, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas v. Johnson*, 491 U.S. 397, 406 (1989). That is particularly true here, since Plaintiff's right to engage in expressive conduct is circumscribed by "the nature of the property and the speech restrictions imposed thereon." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). As discussed in Section III, UVM's reasonable and viewpoint-neutral restriction on erecting tents is constitutionally permissible.[1] And Plaintiff's argument ignores the range of conduct that led to the interim suspension, including the allegation that Plaintiff's members slept in tents on the Commons while also encouraging others to do the same. *See* Compl. Att. 1, ECF No. 1-2, at 2. As the Second Circuit has held, a university has "the right to say that a sleep-in was not an acceptable form of

---

[1] The Temporary Structures policy would still be a reasonable time-place-manner restriction of expression. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The policy is facially neutral as to content since it targets only the conduct of erecting a structure, not "the message it conveys." *Hobbs v. Cty. of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) (quoting *Ward*, 491 U.S. at 791), *cert. denied*, 546 U.S. 815 (2005). It also serves UVM's significant interests, *see id.*, in ensuring the safety of its students and employees, the condition and appearance of its campus, and "the prudent use of [its] financial and human resources." Compl. Att. 8, ECF No. 1-9, at 2; *see also* Defs.' Mot., ECF No. 9, at 9-10; *Bowman v. White*, 444 F.3d 967, 980-81 (8th Cir. 2006). The policy is "narrowly tailored" because it indisputably promotes those interests in a way that would "be achieved less effectively absent the regulation." *Hobbs*, 397 F.3d at 149 (quoting *Ward*, 491 U.S. at 799). And notwithstanding the restriction, there are "ample alternative channels of communication" for Plaintiff to convey its chosen message. *Young v. N.Y. City Transit Auth.*, 903 F.2d 146, 160 (2d Cir. 1990) (quoting *Ward*, 491 U.S. at 802), *cert. denied*, 498 U.S 984 (1990). That is clear from the policy itself, which does not include a blanket proscription on erecting structures but instead limits where and when Plaintiff can do so. *See id.* (holding that ban on panhandling in the subway system left ample alternative channels to communicate to the public about needy individuals). Plaintiff does not, nor could it, allege that "there was, or is, any barrier to delivering to the media, or to the public by other means, the intended message concerning" the Palestine-Israel conflict. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984).

advocacy" in areas of campus used by other students. *Blanton v. State Univ. of N.Y.*, 489 F.2d 377, 387 (2d Cir. 1973).

An interim suspension is not an unconstitutional prior restraint merely because it prevents a student organization from operating as if there were no potential discipline pending against it. *Healy v. James*, 408 U.S. 169 (1972) makes that clear: a university can suspend an organization that "fail[s] to respect campus law" without running afoul of the First Amendment. *Id.* at 194 n.24. The interim suspension's consequences here—i.e. Plaintiff's inability to use campus property or engage in activities for purposes unrelated to the investigation until it is resolved—do not "deprive [Plaintiff's] members of their constitutional right to associate with each other." *Iota XI Chapter of the Sigma CHI Fraternity v. Patterson*, 538 F. Supp. 915, 923-24 (E.D. Va. 2008), *aff'd*, 566 F.3d 138 (4th Cir. 2009).[2]

---

[2] In an effort to distinguish the sorority and fraternity cases cited by Defendants, Plaintiff argues that those groups lack a protected liberty interest in expressive association. Pl.'s Reply in Sup. of Mot. for Prelim. Inj., ECF No. 11, at 2-3. Plaintiff is wrong for three reasons. First, the law requires a more exacting test to determine whether a sorority or fraternity has a protected First Amendment right to associate, and each organization is assessed individually. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987) ("In determining whether **a particular association** is sufficiently personal or private to warrant constitutional protection, we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." (emphasis added)). There is no merit to Plaintiff's position that fraternities and sororities, as a class, do not enjoy a First Amendment right to associate.

Second, the cases considered and rejected Plaintiff's argument. The district court in *Iota XI* concluded that the plaintiff fraternity had a protected right to expressive association because its "institutional mission to inculcate its members with certain leadership skills and community values" had the purpose "to instill values in young people." 538 F. Supp. 2d at 923 (citing and quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648-50 (2000)). The issue was not addressed at length in *Sigma Lambda Upsilon/Senoritas Latinas Unidas Sorority, Inc. v. Rector & Visitors of Univ. of Va.*, 503 F. Supp. 3d 433, 444 n.5 (W.D. Va. 2020), because the defendants conceded that the plaintiff sorority "engages in expressive association for purposes of the First Amendment."

Third, the value in *Iota XI* and *Sigma Lambda Upsilon* is their application of the governing legal framework to expressive-association claims that arose under analogous circumstances. For purposes of the Motion, Defendants acknowledge that Plaintiff has a right to expressive association. Plaintiff's point of disagreement is immaterial.

*Venegas v. Wright State University*, No. 3:16-cv-377, 2017 WL 3605438 (S.D. Ohio Aug. 21, 2017) is an instructive example. Two students made a similar claim after having been prohibited from speaking with other students or university employees about an investigation into their alleged misconduct. The *Venegas* court dismissed their claim out of hand, observing that there was no caselaw "supporting the proposition that a school official prohibiting a student under investigation from discussing the investigation with employees or other students . . . could be considered an unconstitutional prior restraint." *Id.* at *10.

"[I]n light of the special characteristics of the school environment," the law does not hamper UVM's ability to regulate the use of its campus by taking a response that is reasonably calculated to safeguard its educational mission. *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (citation and internal quotation marks omitted). That is particularly true when a student organization has allegedly violated rules designed to protect the safety of its students and equitable access to its facilities and resources.

Plaintiff can find no relief in its conclusory allegation that it lacked notice that an interim suspension might result from its alleged conduct. *See* Compl. ¶ 45. The Student Organization Misconduct Investigation and Resolution policy expressly contemplates a temporary suspension for the type of behavior at issue here. Compl. Att. 2, ECF No. 1-3, at 4. Had its leaders and members read that policy, as was expected of them, *id.* at 2, Plaintiff would have known that it risked an interim suspension if it engaged in conduct that threatened campus safety or disrupted UVM's operations, *id.* at 4. Plaintiff had fair notice that an interim suspension was a possible measure that the University would take. *See Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (concluding that punishment implicating a journalist's First Amendment right to access the White House would be permissible only where the individual received fair notice of the targeted

conduct and the magnitude of a potential sanction).  Because Count I is not legally viable, it should be dismissed.

## II.     Counts II through IV fail because a plaintiff cannot obtain relief without injury.

Plaintiff does not address most of Defendants' jurisdictional arguments.  *Compare* Pl.'s Opp., ECF No. 18, at 12-13, *with* Defs.' Mot., ECF No. 9, at 6.  In any event, the Court lacks jurisdiction over Counts II through V because Plaintiff has not received a sanction that deprives it of a First Amendment liberty interest.  Plaintiff's allegations prove the point.  In Counts II through V, Plaintiff challenges the policies at the heart of the misconduct investigation and any possible punishment that could follow as presumptively unconstitutional.  But what that sanction could consist of is left to the imagination, especially any that **might** implicate Plaintiff's constitutional rights.  *See O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) (holding plaintiff lacked standing where the threat to plaintiff's constitutional rights was merely an anticipated possibility).  Plaintiff's attempt to characterize the policies as having chilled its speech is not enough to create Article III standing.  *See* Compl. ¶¶ 69, 79.  Notably absent from the Complaint (and the Opposition) are any factual allegations explaining how the **policies**—not the interim suspension—have forced Plaintiff to "refrain[] from activity [it] believe[s] the First Amendment protects."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).  For the same reasons, Counts II through V are not ripe.

## III.     Counts II through IV also fail as a matter of law.

Plaintiff tries to save its First Amendment claims based on UVM's policies by attempting to minimize the applicable law and offering new allegations in its Opposition.  The Complaint's actual allegations fail to state a claim, as do the new allegations in Plaintiff's Opposition.

### A.    The Andrew Harris Commons is a limited, and not a traditional, public forum.

Plaintiff argues that the Andrew Harris Commons is "an open or traditional public forum" without any citation to the Complaint or identifying the proper test for such a forum.  Pl.'s Opp., ECF No. 18, at 3.  Plaintiff misunderstands how the forum analysis works.

Traditional public fora are those "which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Zalaski*, 613 F.3d at 341 (citation and internal quotation marks omitted).  On the other hand, a limited public forum "is created when the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects."  *Id.* at 342 (citation and internal quotation marks omitted).  Identifying the nature of the forum turns on "a variety of factors, including the forum's physical characteristics and the context of the property's use, including its location and purpose."  *Id.* (citation and internal quotation marks omitted).

Courts consider public university campuses and operations to be a limited public forum by default.[3]  Plaintiff's allegations fall far short of overcoming this default.  There is no allegation—nor could there be—that UVM has ever allowed the Commons to be used indiscriminately by any member of the public.  *See Hickok v. Orange Cnty. Cmty. Coll.*, 472 F.

---

[3]  *See Keister v. Bell*, 461 F. Supp. 3d 1152, 1169-70 (N.D. Ala. 2020) ("[V]irtually every recent case involving a First Amendment speech challenge to a university policy, regulation, or action has been analyzed under the 'limited public forum' framework." (citation and internal quotation marks omitted)), *aff'd*, 29 F.4th 1239 (11th Cir. 2022), *cert. denied*, 143 S.Ct. 1020 (2023); *Young America's Found. v. Kaler*, 370 F. Supp. 3d 967, 983 (D. Minn. 2019) ("[T]he Supreme Court and Eight Circuit have generally held that both university property (like lecture halls) and university programming (like student activity funds) are 'limited public forums.'"), *vacated on other grounds*, 14 F.4th 879 (8th Cir. 2021); *see also Hotel Empls. Union, Local 100 of N.Y., N.Y. v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002) ("Examples of limited public fora include state university meeting facilities opened for student groups.").

Supp. 2d 469, 474-75 (S.D.N.Y. 2006); *see also R.O. ex rel. Ochshorn v. Ithaca City Sch, Dist.*, 645 F.3d 533, 540 (2d Cir. 2011) (holding that although a school district "opened the newspaper to some or even many types of speech, there is no evidence that the school permitted indiscriminate use by the general public, as is required to create a traditional public forum or designated public forum" (emphases omitted) (citation and internal quotation marks omitted)), *cert. denied*, 565 U.S. 945 (2011).  Instead, there is no dispute that UVM has implemented policies that place limits on who can use the Commons and when and how that use can occur. *Zalaski*, 613 F.3d at 342 (relevant to forum analysis is the "government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations").  The Commons, along with other UVM facilities, are "principally intended for use by University programs, activities, and operations."  Compl. Att. 3, ECF No. 1-4, at 2.  Requests to use that space, whether by members of the student body or the public, are secondary to "University operations and activities," the "safety of persons and security of property," and "the aesthetic appearance of the campus."  *Id.* at 2.  So too is the manner of expression, with temporary structures permitted on the Commons only under limited circumstances.  Compl. Att. 8, ECF No. 1-9, at 2-3.  UVM's "need for controlling" activities on the Commons should come as no surprise.  *Zalaski*, 613 F.3d at 342.  It is a university campus, not a town square.  *Widmar*, 454 U.S. at 267 n.5.

Plaintiff emphasizes the fact that UVM has allowed both students and nonstudents to use the Commons, but this is not dispositive.  *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005) rejected a similar argument.  The Fourth Circuit explained that while "the University allows members of the public to engage in any lawful activity" in a particular area of campus, "it is not determinative because the government does not create a public forum by inaction or by

7

permitting limited discourse." *Id.* (citation and internal quotation marks omitted). Instead, the most important inquiry is whether UVM opened the Commons "for **indiscriminate** use by the general public." *Ochshorn*, 645 F.3d at 540 (emphasis added).

UVM has retained control over who can use the Commons and the way that use can occur. Its need for that control is self-evident. The Commons is a limited public forum, and any restrictions on speech that occurs there "need only be reasonable and viewpoint neutral." *Zalaski*, 613 F.3d at 342.

**B. The challenged policies are constitutionally sufficient.**

For the reasons already discussed in the Motion, UVM's policies governing the Commons easily pass the applicable standard. Defs.' Mot., ECF No. 9, at 8-11. Each challenged policy furthers UVM's significant and justifiable interests, and the restrictions imposed have no regard for the viewpoint of any speaker.

Plaintiff's only response is that the policies are not content-neutral and are not narrowly tailored to serve UVM's significant interests, even if the Commons is a limited public forum. But whether a regulation is content-neutral and narrowly tailored—the standard for time-place-and-manner restrictions—applies only to restrictions on traditional and designated public forums, not limited public forums. *See Zalaski,* 613 F.3d at 341 (elaborating on applicable standard based on nature of forum); *Cyr. v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 546-47 (D. Vt. 2014) (same). Since the Commons is a limited public forum, the only relevant inquiry is whether UVM's policies are reasonable and viewpoint neutral.[4]

---

[4] The same argument discussed in footnote 1 applies to all of the policies challenged by Plaintiff. To whatever extent Plaintiff is restricted from engaging in speech on campus, the policies pass that standard, and Plaintiff is left with viable alternative methods to express its message. *See Clift v. City of Burlington, Vt.*, 925 F. Supp. 2d 614, 640 (D. Vt. 2013) (Sessions, J.). That includes its ability to engage in speech off campus and through alternative channels of communication such as "electronic media and social-networking sites." *Christian Legl Soc'y Chapter of the Univ. of Ca., Hastings College of the Law v.*

**C. The Complaint fails to sufficiently allege pretext or unconstitutional discretion.**

Plaintiff implicitly acknowledges that its Complaint lacks the factual allegations necessary to state a claim that UVM's reasonable and facially neutral policies were used as a pretext to censor Plaintiff. To make up for this, Plaintiff would like to "proffer" new facts and rely on other documents not properly before the Court. Pl.'s Opp., ECF No. 18, at 4-5, 8-9. But the Court cannot consider "factual allegations contained in legal briefs or memoranda . . . in ruling on a 12(b)(6) motion to dismiss." *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000). These unalleged facts must be disregarded. But even if Plaintiff's newly proffered allegations were considered, the claims would still fail.

**1. The facts actually alleged fail to state a claim.**

Looking only to the Complaint, it does not allege that the policies were pretextually applied to Plaintiff. Hardly any of the purported comparators are student groups—which Plaintiff does not dispute. None engaged in a multi-day sleep-in encampment on any part of UVM's campus. Instead, students and other individuals are alleged to have marched into buildings or through campus during the day, blocked traffic on a public street not owned by UVM, walked out of classes, marched through campus, or used cannabis. Plaintiff has not adequately alleged that UVM's enforcement of its policies against Plaintiff was pretextual viewpoint discrimination.

The same issues remain with Plaintiff's claim that the permitting scheme for using campus property or erecting temporary structures provides for unbridled discretion. But ignoring Plaintiff's new allegations, the Temporary Structures policy includes "narrow, objective, and

---

*Martinez*, 561 U.S. 661, 691 (2010). While Plaintiff might have an "understandable wish to engage with [students] on a personal level, the First Amendment does not guarantee [it] an unqualified right to do so." *Clift*, 925 F. Supp. 2d at 640.

definite standards" that provide "sufficient guidance to prevent arbitrary denials of permit

applications." *Hobbs v. Cty. of Westchester*, 397 F.3d 133, 150 (2d Cir. 2005), *cert. denied*, 546

U.S. 815 (2005). It sets forth the procedure to obtain a permit to erect a temporary structure,

identifies who will act as decisionmaker, and states that the approval process is governed by the

Facilities & Ground Use policy. Compl. Att. 8, ECF No. 1-9, at 2-3. That latter policy, in turn,

explains that approval is only subject to safety and health concerns, in addition to time, place,

and manner considerations, with a decision generally made within two days. Compl. Att. 3, ECF

No. 1-4, at 2-4. And the Posting and Solicitation policy clarifies that an application to use

campus space must be assessed on a viewpoint-neutral basis. Compl. Att. 4, ECF No. 1-5, at 3.

Overall, the policies allow anyone to apply, identify the process for applying, contain guidelines

to reach that decision, and afford an applicant with an appeals process should they be denied. *Cf.*

*Viewpoint Neutrality Now! v. Regents of Univ. of Minn.*, 516 F. Supp. 3d 904, 924-25 (D. Minn.

2021) (presence of none of these characteristics sufficient to show unbridled discretion).

The policies here stand in stark contrast to those at issue in the cases Plaintiff cites. They

do not involve interpreting vague concepts, relying on established practice, or subjecting a

request to the exercise of unrestrained judgment. *See MacDonald v. Safir*, 206 F.3d 183, 192-93

(2d Cir. 2000). They do not vest a single decisionmaker unfettered discretion to "grant or

withhold a permit upon broad criteria unrelated to proper regulation of public places" such as

"'welfare,' 'decency,' or 'morals' of the community." *Shuttlesworth v. City of Birmingham, Ala.*,

394 U.S. 147, 153 (1969). Instead, UVM's policies provide clear, narrow, and objective

standards that allow for effective judicial review in the event of a denial. *Amidon v. Student*

*Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 103 (2d Cir. 2007). The law does not require

the "perfect clarity and precise guidance" that Plaintiff demands. *Id.* (quoting *Ward*, 491 U.S. at 794).

###### 2. Plaintiff's new allegations do not cure the legal deficiencies.

Plaintiff's attempt to graft new facts onto its claims still would not render them legally sufficient. First, Plaintiff asserts that an unaffiliated student submitted a request to erect tents on the Andrew Harris Commons soon after the encampment began, the Chief Safety and Compliance Officer denied the request, and said he would have approved it if the structure consisted of "a pop-up tent with no sides." *See* Pl.'s Opp., ECF No. 18, at 4-5. How these new allegations move the needle in Plaintiff's favor is unclear. If anything, they establish that UVM was willing to grant the request to erect temporary structures on the Commons so long as they did not totally encase their inhabitants. Like *Ward*, these facts establish only that UVM restricted the nature of the temporary structure, not temporary structures outright. *See Ward*, 491 U.S. at 795 & 795 n.5 (observing that a facial challenge to guidelines regulating volume and sound quality was not available where the guidelines provided the city with flexible standards to regulate the quality and volume of music and did not prohibit all music).

Plaintiff also represents that "the vast majority of the students participating in the protest chose not to sleep in the tents." Pl.'s Opp., ECF No. 18, at 8. While Plaintiff uses this new allegation to argue that the sleeping violations were *de minimis*, it does not explain how that point is relevant to the constitutional analysis. There were still "8 to 20 students" who were allegedly sleeping in tents on the Andrew Harris Commons for days, *id.*, and Plaintiff's role in those potential policy violations is not diminished by its allegation that it was apparently unsuccessful in convincing more students to join in its alleged misconduct.

Finally, Plaintiff refers to a new allegation that UVM's investigation did not commence

until September 13, 2024, and that it consisted solely of interviews of its own employees and

officers.  *See id.* at 9.  Plaintiff states that there was no reason for UVM to have delayed its

investigation until after it filed this lawsuit and that the only reasonable inference is that UVM

pretextually used the delay to prolong the interim suspension.  *Id.*  But Plaintiff's own allegations

belie this claim.  Plaintiff effectively concedes that it refused to participate in the process that

was the predicate to UVM beginning the investigation.  When its counsel requested that UVM

re-evaluate the interim suspension, UVM's counsel responded that Plaintiff's only options were

to participate in either "(a) an administrative conference or (b) the investigation process."

Compl. ¶ 40.  That response made sense.  Under the Student Organization Misconduct

Investigation and Resolution policy, an administrative conference precedes a formal

investigation, allowing a student organization to resolve misconduct allegations before an

investigation is initiated.  Compl. Att. 2, ECF No. 1-3, at 5.  When an administrative conference

is offered, the investigation does not begin unless the student organization refuses that offer.  *See*

*id.*  But Plaintiff does not contend that it ever refused the offer of an administrative conference

by electing to contest the misconduct allegations.  The only reasonable inference is that

Plaintiff's own conduct, in combination with the summer break, led to the delay it now seeks to

use as pretextual evidence.

      For these reasons, Counts II through IV should be dismissed for failure to state a claim.

## IV.  Plaintiff has received procedural due process.

      According to the Complaint, Plaintiff's procedural due process claim in Count VI

concerns the Student Organization Misconduct Investigation and Resolution policy's post-

suspension investigative and sanction process.  *See* Compl. ¶¶ 82-83.  Plaintiff now appears to be

arguing that its procedural due process claim encompasses both the interim suspension and the

post-suspension procedures.  Pl.'s Opp., ECF No. 18, at 5-7, 10-13; *cf.* Compl. ¶ 45 (alleging that

the interim suspension is a presumptively invalid prior restraint because, *inter alia*, Defendants

failed to provide Plaintiff with notice or an "opportunity to be heard regarding[] the suspension

order").  Either way, both the interim suspension and the post-suspension procedures are

constitutionally adequate.

> **A.  The interim suspension satisfied due process.**

Plaintiff suggests that the interim suspension cannot stand because it was not provided

with sufficient notice that an interim suspension was a possibility.  For the reasons already

discussed in Section I, this argument fails as a matter of law.  Plaintiff should have understood its

obligations by reading the policies it has been accused of violating.  *See* Compl. Att. 2, ECF No.

1-3, at 2, 4.  Had Plaintiff done so, it "could reasonably be expected to have known that [its]

conduct was proscribed" and that it might face an interim suspension.  *Marchi v. Bd. of Coop.*

*Educ. Servs. of Albany*, 173 F.3d 469, 480 (2d Cir. 1999), *cert. denied*, 528 U.S. 869 (1999).

Plaintiff's choice to ignore the notice does not mean it was unconstitutionally deprived of notice.

*See Wilson v. Johnson*, 247 Fed. App'x 620, 626-27 (6th Cir. 2007) (holding that student's

ignorance of the university's policy prohibiting vandalism of its buildings was "no defense"

where policy was published and generally available).

Plaintiff further suggests that because Defendants did not have "the tents forcibly

removed or provide [Plaintiff] as an organization with a notice of trespass," Defendants waived

the right to enforce any policies implicated by Plaintiff's conduct.  *See* Pl.'s Opp., ECF No. 18, at

7-8.  Plaintiff cites no legal authority—and indeed there is none—that required Defendants to

dramatically escalate the situation in order to apprise Plaintiff of its potential policy violations or

retain the ability to enforce its reasonable policies.  The only case that Plaintiff relies on, *Mitchell*

*v. City of New Haven*, 854 F. Supp. 2d 238 (D. Conn. 2012), does not support this untenable proposition.  If anything, Plaintiff's waiver argument itself would be constitutionally problematic.  *See id.* at 251 (noting that a standardless policy that allows the authority to waive a permit requirement would be unconstitutional).

As for Plaintiff's opportunity to be heard, Plaintiff does not expand on what it claims would be required at this stage.  Plaintiff was not entitled to a pre-deprivation hearing because its conduct risked the safety of students and others, and the suspension only temporarily restricted Plaintiff's access to limited public fora located on UVM property.  *Cf. Pordum v. Bd. of Regents of State of N.Y.*, 491 F.2d 1281, 1284 (2d Cir. 1974) (a pre-deprivation hearing was not required where the safety of students was the basis for a temporary suspension), *cert. denied*, 419 U.S. 843 (1974).  Nor was it deprived of an "opportunity to be heard regarding[] the suspension order."  Compl. ¶ 45.  The Student Organization Misconduct Investigation and Resolution policy expressly contemplates a reevaluation of an interim suspension once "additional information is learned" during the investigatory process.  Compl. Att. 2, ECF No. 1-3, at 4.  While Plaintiff complains that UVM refused to provide it with a special procedure for reconsidering the interim suspension (Compl. ¶ 40), at no point does Plaintiff assert that Defendants refused to accept additional information.  And as discussed below, Plaintiff had the opportunity to provide any information it wanted to during the investigative phase but instead refused to participate.

**B.  The post-suspension misconduct procedure satisfies due process.**

The May 1, 2024 notice to Plaintiff ("Notice"), which is attached to the Complaint, likewise satisfies due process and speaks for itself.  Compl. Att. 1, ECF No. 1-2.  The Notice provided Plaintiff with the specific allegations of misconduct, the policies alleged to have been violated, and the process moving forward.  *Id.* at 2-4.  Based on the Notice's content, Plaintiff

14

was provided with "specific factual allegations" and received all the notice required to respond. *Spinelli v. City of New York*, 579 F.3d 160, 171-72 (2d Cir. 2009). That it has chosen not to participate in that process is no fault of Defendants.

Plaintiff claims that it was entitled to disregard the policies (that it simultaneously claims to have been unaware of during the encampment) based on a good-faith belief that they were unconstitutional. *See* Pl.'s Opp., ECF No. 18, at 6-8. Plaintiff does not explain how this argument figures into a due process claim and seems to blend it into its First Amendment argument without any support. *See id.* at 6-8. In any event, a party is not excused from abiding by an otherwise constitutional rule or requirement simply because it had a "good faith" belief it was unconstitutional. Plaintiff's position is not supported by any of the cases it relies on, most of which have nothing to do with a "good faith" excuse. And the good-faith defense discussed in *Wagner Seed Co. v. Daggett*, 800 F.2d 310, 315-16 (2d Cir. 1986) concerns the risk of accruing monetary penalties **during pending litigation** when a plaintiff has a good faith belief that it was not subject to penalties in the first place. As the Second Circuit explained, "[o]ne way of ensuring that a plaintiff is not faced with such unconstitutional penalties is to require that no penalty be imposed where a challenge was brought in good faith," since debilitating penalties during that interim period would amount to coercion. *Id.* at 315-16. Plaintiff's reading of *Wagner* would effectively excuse any party from abiding by a regulation **before** challenging that regulation's constitutionality. No court has ever expanded *Wagner* this way.

*Shuttlesworth* similarly does not provide a basis to absolve Plaintiff of its pre-litigation conduct. *See* Pl.'s Opp., ECF No. 18, at 8 n.5. To be sure, *Shuttlesworth* states the uncontroversial principle that someone encountering an "unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the

law purports to require a license." 394 U.S. at 151. However, Plaintiff was not faced with an unconstitutional permitting scheme—even if it believed UVM's policies were unconstitutional when it participated in the encampment protest. *Shuttlesworth* may allow Plaintiff to ignore unconstitutional regulations, but it does not excuse Plaintiff from disregarding policies that a court determines are, in fact, constitutional.

Finally, the post-suspension process provides Plaintiff with a meaningful opportunity to be heard. The law simply does not require UVM "to transform its classrooms into courtrooms in pursuit of a more reliable disciplinary outcome." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017) (citation and internal quotation marks omitted). Plaintiff is not entitled to legal counsel under these circumstances. *See Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993). Beyond that, the Student Organization Misconduct Investigation and Resolution policy (Compl. Att. 2, ECF No. 1-3) sets forth an adequate procedure where Plaintiff is offered an opportunity at the administrative conference to "discuss the incident." *Id.* at 5. This provides Plaintiff the chance to give its "side of the story" before an determination is made on the misconduct allegations. *Gilbert v. Homar*, 520 U.S. 924, 929 (1997). By its own admission, Plaintiff was offered that chance but refused. Compl. ¶ 40. But that is not Plaintiff's only opportunity, even if it refuses an administrative conference. Plaintiff could submit information and have an opportunity to meet with the investigator "to comment on the content" of the investigator's report before the report is finalized. *See* Compl. Att. 2, ECF No. 1-3, at 6. Plaintiff's refusal to avail itself of a constitutionally sufficient process does not give rise to an independent due process claim. Accordingly, Counts V through VI fail as a matter of law.

## CONCLUSION

For all the reasons set forth above and in Defendants' Motion to Dismiss, this Court lacks jurisdiction and Plaintiff's claims lack merit.  Accordingly, the Complaint should be dismissed.

Dated at Burlington, Vermont this 12th day of November 2024.


/s/ Kendall Hoechst
Kendall Hoechst, Esq.
Dinse P.C.
209 Battery Street, P.O. Box 988
Burlington, VT  05402
(802) 864-5751
khoechst@dinse.com

Counsel for Defendants